## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF EIGHT CELL PHONES CURRENTLY IN DEA CUSTODY, FURTHER DESCRIBED IN ATTACHMENT A | No. 1:24-mj-00214-JCN **FILED UNDER SEAL** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Nicholas Rich, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—eight electronic devices—which are described in Attachment A and currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the U.S. Drug Enforcement Administration ("DEA") and have been since February of 2008. I am presently assigned to the Bangor, Maine, office and have received extensive training pertaining to narcotic investigations and the investigation of various crimes which arise from drug trafficking activities. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c). As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. During my employment with DEA, I have participated in numerous investigations relating to the distribution of controlled substances, including cocaine, heroin, fentanyl, methamphetamine, diverted pharmaceuticals, and other substances in violation of the federal anti-drug laws, including Title 21, United States Code, Sections

841 and 846. I have conducted or participated in, among other things, surveillance, the execution of search and arrest warrants, debriefings of informants and confidential sources, and reviews of recorded conversations relating to narcotics trafficking. I have authored drug-related search warrant requests and successfully executed such warrants resulting in the seizure of drugs and other contraband, including firearms. I have also assisted in the execution of numerous drug-related search and arrest warrants. I have received extensive training in the field of narcotics enforcement and investigations. I am very familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs, including the use of the internet, internet platforms, applications, and cellular telephones to facilitate those activities.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested warrant.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of federal law, to include 21 U.S.C. § 841(a)(1), 21 U.S.C. § 846, and 21 U.S.C. § 843(b) (hereinafter "Target Crimes") have been committed by one or more persons. There is also probable cause to search the devices described in Attachment A for evidence of these crimes, as described in Attachment B.

## ITEMS TO BE SEARCHED

5.    I seek a warrant to search the items more fully described in Attachment A, hereinafter "the Subject Devices." The Subject Devices are all in secure evidence storage with DEA, each with an assigned evidence exhibit number as below. The Subject Devices are further identified and photographed in Attachment A, and additionally as follows:

|  | Device Description | Suspected Owner/User |
|---|---|---|
| Device 1 | Apple iPhone in red case; identified in evidence as DEA Exhibit N11 | Ramon De Leon |
| Device 2 | Silver Apple iPhone; identified in evidence as DEA Exhibit N12 | Ramon De Leon |
| Device 3 | Red Apple iPhone; identified in evidence as DEA Exhibit N13 | Alexis De Leon |
| Device 4 | Black Apple iPhone; identified in evidence as DEA Exhibit N14 | Alexis De Leon |
| Device 5 | Apple iPhone in pink case; identified in evidence as DEA Exhibit N18 | Stephanie Arias-Baez |
| Device 6 | Black "TCL" brand phone; identified in evidence as DEA Exhibit N16 | Michael Perry |
| Device 7 | Black Samsung phone; identified in evidence as DEA Exhibit N15 | Craig Hurd |
| Device 8 | Black phone of unknown make; identified in evidence as DEA Exhibit N17 | Shannon Bullock |

6.    The applied-for warrant would authorize forensic examination of the Subject Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7.    The DEA, together with partner agencies, has been investigating a subject known as "Leon Leon" and "Leon" for utilizing a particular Facebook Account

3

(described for purposes of this affidavit as the "Leon Leon Account") and phones, in the distribution of illegal controlled substances in the Bangor region. Specifically, the DEA has developed information that a Boston resident named Alexis De Leon, together with multiple associates, used the Leon Leon Account and also cellular telephones to arrange for the distribution of drugs in eastern Maine. Leon and other individuals made short trips from Boston to the Bangor region to distribute drugs and collect drug proceeds from Maine sub-distributors.

### Pertinent Background

8.      On February 7, 2024, the DEA applied for and obtained a search warrant from this Court in 1:24-mj-34-JCN, which authorized the collection of prospective location information as to a T-Mobile cellular telephone assigned 917-963-3689 (the "3689 number"). The affidavit submitted in support of that application is attached as Exhibit 1. The affidavit in Exhibit 1 explains the background of this investigation and the identification of both the Leon Leon Account and the 3689 number. Exhibit 1 is expressly incorporated herein for purposes of probable cause.

### Jane Doe 5 Interview & Cooperation

9.      The DEA came to believe that Jane Doe 5 was a customer of Leon, due largely to a significant number of contacts between a phone associated with Jane Doe 5 and the 3689 number.[1] On March 29, 2024, I interviewed Jane Doe 5, who admitted to

---

[1] Jane Doe 5 was already involved in an ongoing ATF investigation involving a January 2024 seizure of drugs and guns from her residence and a nearby camper. Jane Doe 5 had previously been interviewed by the ATF in regards to that investigation and did not at that time disclose any relationship to the Leon DTO. Jane Doe 5 has a significant criminal history, including prior felony convictions in Maine for drug trafficking, thefts, and burglary.

recently purchasing fentanyl from Leon and doing so via communications with the 3689 number. Jane Doe 5 showed communications on her phone which, based on my training and experience, were consistent with her arranging purchases of controlled substances with Leon at the 3689 number.

10.     Following this interview, Jane Doe 5 agreed to perform a controlled purchase of controlled substances from Leon, at the direction of MDEA and DEA. On April 2, 2024, Jane Doe 5 communicated with Leon and coordinated the purchase of approximately 30 grams of fentanyl in Bangor, Maine. On that date, the GPS ping of 3689 number remained in the Dorchester, MA area. Jane Doe 5 was outfitted with a covert audio and video recording device and provided serialized U.S. Currency. At approximately 12:45 P.M., agents observed a Massachusetts plated vehicle, registered to Dianet Soto Sanz, arrive to Jane Doe 5's location. Agents subsequently identified the driver as Soto Sanz, and the passenger as Ramon De Leon. Jane Doe 5 met with Ramon De Leon in her vehicle and recorded the purchase of approximately 30 grams of suspected fentanyl for $600.00. The suspected fentanyl was retrieved by agents from Jane Doe 5, and she confirmed she had completed the agreed-upon transaction.

*Identification of the 9606 Number*

11.     Before the events of April 2, 2024, I had come to believe that the individual utilizing the 3689 number would soon be changing that number. As explained in Exhibit 1, Leon had previously switched phone numbers with his customers, as is common with individuals seeking to avoid law enforcement detection. Jane Doe 5 had also shown me a text message, sent from the 3689 number on approximately March 23, 2024, with the following message: "Greetings, I will change

my number tomorrow for security and to take care of myself more I will send you a message with my name Leon tomorrow."

12.    On April 5, 2024, Jane Doe 5 received a message from (207) 735-9606 (the 9606 number) as follows: "Brother, how are you? I'm Leon. This is my new number, brother. I put the Maine number. It's me, Alex." At the direction of agents, Jane Doe 5 messaged the 9606 number regarding an additional purchase of fentanyl. The 9606 number responded: "All right, let me know how for when if for Monday or so."

13.    Based on the above information and additional information submitted at that time, I applied for and obtained a warrant to obtain prospective location information as to the 9606 number from T-Mobile in 1:24-mj-00112-JCN.

14.    On April 18, 2024, the 9606 number messaged Jane Doe 5 and, based on my training and experience and interpretation of the messages I reviewed, advised her that he would be in Maine to deliver fentanyl on April 21, 2024. At the direction of agents, Jane Doe 5 requested to purchase 30 grams of fentanyl for $600. On April 21, 2024, at approximately 7:40 a.m., information provided from T-Mobile showed the 9606 number moving from Dorchester, Massachusetts and towards Maine. Jane Doe 5 later conducted an audio and video recorded controlled purchase of suspected fentanyl at a business parking lot in Newport, Maine. Specifically, the CI entered the back seat of a Honda SUV bearing a Massachusetts plate, which was registered to Alexis De Leon in Massachusetts. She described there being two males in the back seat of the SUV, which was driven by an unknown female. Jane Doe 5 described the males in the back seat area as the "brothers" she had previously purchased from, which I understood to be Ramon

De Leon and Alexis De Leon. She stated she had entered the vehicle and provided the buy money to Ramon De Leon in exchange for the suspected fentanyl that she later turned over to agents. I later reviewed the video footage from this buy and identified both Alexis De Leon and Ramon De Leon as being the vehicle's rear passengers.

15.     Following events of April 21, 2024, location data was received from T-Mobile that indicated the 9606 number made multiple additional trips from the Boston region to eastern Maine. These included same-day trips to Maine on April 25, 2024, April 28, 2024, and May 4, 2024.[2]

*June 11th Arrests and Seizure of Devices 1-5*

16.     Leading up to June 11, 2024, at the request of agents, Jane Doe 5 requested to purchase additional fentanyl from the Leon DTO, via communications with the 9606 number. Based on my training and experience and interpretation of those messages, I believed Alexis De Leon agreed to travel to a specific area in Maine on June 11, 2024, in order to provide Jane Doe 5 with fentanyl.

17.     On June 11, 2024, DEA agents in Boston observed that at approximately 7:30 a.m. Alexis De Leon and Ramon De Leon and an unknown female exited the basement of 670 Columbia Road in Boston and entered the white Honda SUV registered to Alexis De Leon. They were then monitored via location data on the 9606 number and a tracker installed on that vehicle pursuant to authority in the District of Massachusetts. The vehicle entered Maine and Maine State Police ultimately conducted a traffic stop of the vehicle on I-95, north of Fairfield.

---

[2]  There have been a number of other developments, warrants, controlled purchases, and suspected fentanyl seizures in this investigation that are not summarized herein.

18.     As a trooper approached the vehicle, it appeared to the trooper that the rear vehicle passengers were attempting to destroy a powdered substance by pouring liquid over it. Ramon De Leon and Alexis De Leon were then both removed from the rear passenger area of the vehicle and detained. The female driver was also identified as Stephanie Arias Baez and she was removed from the vehicle and identified as the same female who had entered the vehicle that morning at 670 Columbia Road.

19.     I observed what appeared to be fentanyl powder on the rear floor of the vehicle, several plastic bags of substance that appeared to be pre-packaged amounts of fentanyl powder, and also a large plastic tub partially full of what appeared to be fentanyl powder. Testing and analysis of these substances is not complete at the time of this writing. However, based on the appearance of the substances and my training and experience, and also statements made by Alexis De Leon, it appears these substances are fentanyl powder and cocaine base. The total weight (including packaging) of substance containing suspected controlled substances seized from this vehicle appears to be over 2 kilograms. There were also multiple phones in the rear seating area of the vehicle.

20.     Alexis De Leon was Mirandized and interviewed, with the assistance of an officer fluent in Spanish. He ultimately stated that he had been bringing fentanyl to Maine for distribution since approximately August of 2023. He acknowledged he resided at 670 Columbia Road in Boston and that additional fentanyl would be located there. He identified the substances in the vehicle as fentanyl and crack cocaine.

21.     Ramon De Leon was Mirandized and interviewed, with the assistance of an officer fluent in Spanish. He ultimately stated he had been coming to the Bangor region to distribute drugs for multiple years. A plastic bag containing a distributor-

8

quantity of suspected fentanyl was removed from his person as he was booked into custody.

22.     Stephanie Arias Baez was interviewed. She stated she had made 3-4 trips to Maine, driving Ramon and Alexis De Leon to the Bangor region each time. She was confronted with a photograph of the female driver who was involved in the April 21st controlled buy operation described above and Baez acknowledged that was one of the trips she had made. She stated she believed they were only distributing marijuana. There was, however, no marijuana recovered from the vehicle on June 11, 2024.

23.     Devices 1-5 were seized from these subjects and the vehicle. Ramon De Leon identified Devices 1-2 as his own. He provided a passcode for Device 1 and stated Device 2 did not require a passcode. Alexis De Leon identified Devices 3-4 as his own. He provided passcodes for these devices. Additionally, I dialed the 9606 number and a corresponding call appeared on Device 3. Device 5 was seized from Arias Baez and she identified that phone as her own. She provided a passcode to access that device.

24.     The Boston residence where Ramon and Alexis De Leon were seen leaving the morning of June 11, 2024, was searched pursuant to a warrant issued in the District of Massachusetts. Substances seized from that residence have not yet been tested. However, it appears that over 2 kilograms of suspected fentanyl powder were seized from that residence, as well as multiple presses designed for compacting powdered substances into rectangular "brick" form. A woman who identified herself as Alexis De Leon's mother was also present at the time and found in possession of one cellular phone that she claimed as her own. No other cellular phones were located during the search of that residence.

*Seizure of the Devices 6-8*

25.     Following the above-described Miranda warning, through assistance of interpretation, Alexis De Leon expressed a willingness to assist investigators obtain evidence as to suspected Bangor area customers and fentanyl distributors. He stated that he had intended to distribute substances on June 11th to several identified Bangor-area customers. The quantities and frequencies that he described having previously distributed to these individuals is, in my training and experience, not consistent with customers who are purchasing from Leon solely for personal use. Alexis De Leon agreed to utilize Device 3 under the supervision and monitoring of officers, to help law enforcement identify evidence against individuals suspected of being local distributors in the Bangor region.

26.     De Leon identified Michael Perry as one prior customer that was expecting a delivery of controlled substances on June 11, 2024. I was familiar with Michael Perry as he had been in regular contact with phone numbers used by Alexis De Leon during this investigation and was suspected of distributing fentanyl obtained from De Leon. For example, on February 27, 2024, Alexis De Leon and Ramon De Leon made a trip to the Bangor region and were positively identified together in a vehicle. A phone assigned call number 207-745-3504 had at that point been identified via law enforcement databases as belonging to Michael Perry. On February 27th, that phone number had at least 15 contacts with the 3689 number. Going back even farther, I have identified that same phone number as in frequent contact with the phone number used by Alexis De Leon as far back as October and November of 2023. And that phone

continued regular contact with numbers used by De Leon between February and June of 2024.

27.    On June 11, 2024, De Leon used his phone to communicate with Michael Perry at the above number and directed him to meet at a particular location to obtain fentanyl from De Leon. In responsive communications, Perry seemed to agree to that meet location and described the vehicle he would be in. Officers responded to that location and located Michael Perry in a vehicle matching that description. He was approached and interviewed. He acknowledged that he had a longstanding relationship with De Leon and had been supplied fentanyl by De Leon for a time period spanning multiple months. He had in his possession Device 6 and acknowledged he had communicated with "Leon" on that device. Device 6 was seized for further analysis.

28.    De Leon also identified Craig Hurd as a longstanding fentanyl customer of his in the Bangor region. Hurd had also been identified as a suspected customer of De Leon and local distributor of fentanyl during this investigation. For example, in Facebook information received from Facebook as to the Leon Leon Account, De Leon had communications spanning back to January of 2024 with a Facebook account utilized by Craig Hurd and in his name. In those communications, in my training and experience and interpretation, Hurd and De Leon arranged for multiple fentanyl transactions. Additionally, multiple times during this investigation, including in May of 2024, members of the Leon DTO have been observed at Hurd's known residence in Kenduskeag, Maine.

29.    On June 11, 2024, De Leon used his phone to communicate with Craig Hurd at the direction of agents and directed Hurd to meet at a particular location to

11

obtain fentanyl from De Leon. In responsive communications, Hurd seemed to agree to that meet location and described the vehicle he would be in. Officers at that location located Hurd. He was approached and agents spoke to him. He had in his possession Device 7. He acknowledged Device 7 had been used to communicate with Leon at the 9606 number. Device 7 was seized for further analysis.

30.     De Leon also identified Anthony Merrow as a longstanding fentanyl customer of his in the Bangor region. Merrow too had already been identified as a suspected customer of De Leon and local distributor of fentanyl during this investigation. For example, during the same February 27, 2024, confirmed Leon DTO trip to Maine referenced above, the Leon Leon Account had approximately 16 communications with Anthony Merrow's Facebook account held in his own name. Facebook data was received from Facebook as part of this investigation that also showed, in my training and experience, communications between Merrow's Facebook account and the Leon Leon Account going back to January of 2024. For example, on January 14, 2024, Merrow's Facebook account messaged to the Leon Leon Account: "I want 100 grams ok brother. I will b ur 1st guy of the day meet me at happy china buffet." Data received from Facebook showed continued contact between the Leon Leon Account and Anthony Merrow's account through May of 2024.

31.     On June 11, 2024, De Leon stated he had been in communication with Merrow about distributing drugs to Merrow on this trip to Maine. He showed agents his communications, which appeared to be with a contact identified as "Shanny." De Leon then explained that "Shanny" was actually Merrow's sister and that he had dealt with "Shanny" in the past, in relation to supplying drugs to Merrow. He then

12

communicated with this contact at the direction of agents to arrange a particular meeting location so "Shanny" could obtain fentanyl from De Leon on June 11th. Officers at that meet location and time located Shannon Bullock, who was by then known to investigators as Merrow's sister. She was approached and interviewed. She was searched for a phone, as investigators knew she was communicating directly with Leon. Device 8 was seized from her person. She was also found in possession of a small amount of suspected methamphetamine as well as a digital scale.

*Pertinent Agent Experience and Inferences*

32.      In my experience, it is common for drug traffickers to maintain multiple phones at any given time. Additionally, traffickers residing outside Maine but distributing to Maine customers often maintain one phone for their "downstream" customers and associates in Maine, but separate phones for their peer traffickers and suppliers. This is a common technique for preventing law enforcement from identifying the full scope of a drug trafficking organization. Ramon and Alexis De Leon each had two phones during the traffic stop described above. I believe that all four of those phones are likely to obtain evidence identified in Attachment B. Moreover, I believe that communications between the three occupants of the vehicle on June 11th would likely be found on any of the five phones present in that vehicle and would provide important evidence of the relationship between those people, their knowledge, and any agreement to distribute drugs. For example, as explained above, there is evidence that Ramon De Leon and Stephanie Arias Baez made at least one trip on April 21st without Alexis De Leon and they would have needed to communicate extensively as customers were communicating directly with Alexis De Leon at the 9606 number.

33.    As to Devices 6-8, I believe those devices are likely to obtain communications with the 9606 number as all three devices actively communicated with that 9606 number on June 11th and there is evidence of prior communications and drug transactions with Alexis De Leon. I believe they are also likely to hold communications with customers of those phones' users and other local suppliers. It is common for those involved in local drug distribution to obtain drugs from more than one supplier and to communicate with associates who are also involved in drug distribution, as well as their customers, and to do so via phone.

34.    As to all Subject Devices, I believe pertinent material will be located on the Subject Devices at least as far back as February 1, 2024. As explained above, Alexis and Ramon De Leon each admitted to distributing drugs well before February of 2024. Michael Perry and Craig Hurd had known contacts directly with Leon well before February of 2024. Shannon Bullock appears to have been working with her brother Merrow, according to Alexis De Leon. And Merrow had known identified contacts with De Leon well before February of 2024.

*Status of Devices to be Searched*

35.    The Subject Devices are currently in the lawful possession of DEA. They each came into the agency's possession as a result of the seizures describe above. I seek this warrant to be certain that an examination of the Subject Devices will comply with the Fourth Amendment and other applicable laws. The Subject Devices are currently in storage at an evidence locker at DEA Bangor Post of Duty Office in Hermon, Maine. In my training and experience, I know that the Subject Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in

14

substantially the same state as they were when the Subject Devices first came into the possession of the DEA.

## TECHNICAL TERMS

36.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital

cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24

16

NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Internet: The Internet is a global network of computers and other
electronic devices that communicate with each other.  Due to the structure
of the Internet, connections between devices on the Internet often cross
state and international borders, even when the devices communicating
with each other are in the same state.

37.    Based on my training, experience, and research, I know that the Subject
Devices have capabilities that allow them each to serve as a wireless telephone, digital
camera, portable media player, GPS navigation device, and PDA. They are also capable
of accessing the internet. In my training and experience, examining data stored on
devices of this type can uncover, among other things, evidence that reveals or suggests
who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

38.    Based on my knowledge, training, and experience, I know that electronic
devices can store information for long periods of time. Similarly, things that have been
viewed via the Internet are typically stored for some period of time on the device.  This
information can sometimes be recovered with forensics tools.

39.    *Forensic evidence.*  As further described in Attachment B, this application
seeks permission to locate not only electronically stored information that might serve
as direct evidence of the crimes described on the warrant, but also forensic evidence
that establishes how the Subject Devices were used, the purpose of its use, who used it,
and when.  There is probable cause to believe that this forensic electronic evidence
might be on the Subject Devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

40.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

41.     *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

42.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Subject Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Nicholas Rich, Special Agent
U.S. Drug Enforcement Administration

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedure

Date: __Jun 25 2024__

City and state: _____Bangor, ME_____

John C Nivison U.S. Magistrate Judge
*Judge's signature*
*Printed name and title*